FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2012 AUG 30 PM 3: 13

CLERK _R. Quex_
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

UNITED STATES OF AMERICA,　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　:　　CIVIL ACTION NO.: CR212-006
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
JONATHAN DEREK FOSKEY　　　　　　　:

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Jonathan Derek Foskey ("Defendant") has been charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a).　Defendant filed a Motion to Suppress, to which the Government filed a Response.　Defendant also filed a Motion for Hearing on Jackson v. Denno issues.　The undersigned conducted an evidentiary hearing on August 9, 2012, at which Gary Allen Dixon, Tracy Giessman, and Eric Fernando Melendez testified.　The Defendant filed a post-hearing brief.

## FINDINGS OF FACT

The credible testimony at the evidentiary hearing establishes the following:

On September 8, 2011, Dixon was on patrol with the Glynn-Brunswick Narcotics Enforcement Team.　(Tr. at 5–6).　Dixon and another officer, Davis, were wearing plain clothes with "Police"-marked protective vests, and Davis was driving his unmarked Jeep Cherokee.　(Tr. at 6).　Dixon and Davis were performing surveillance on a residence suspected of dealing in prescription pills; they saw activity at the residence consistent

with dealing narcotics—cars came to the house, car occupants briefly interacted with a person from the house, and the cars left. (Tr. at 7). Dixon and Davis saw Defendant's car pull into the driveway, stay a short amount of time, and leave. (Id.). When Defendant's car left the house, Dixon and Davis drove behind him and noticed that the driver's side brake light was not working and that Defendant was not wearing his seat belt.[1] (Tr. at 8). Dixon and Davis initiated a traffic stop of Defendant's car based on the traffic violations they noticed.[2] (Tr. at 9).

After Defendant stopped his car, Dixon noticed that Defendant made "a lot of movements[.]" (Tr. at 10). Defendant reached downward and behind him, which is a movement inconsistent with movements Dixon has normally observed from drivers reaching for identification information relevant to a traffic stop. (Tr. at 11). Upon reaching Defendant's car, Davis instructed Defendant to step out of the car for safety reasons. (Id.). Once Defendant was out of his car, Davis took Defendant's driver's license to the unmarked Jeep to do a license check. (Id.).

While Davis was in his Jeep, Dixon spoke with Defendant. (Id.). Defendant did not make eye contact with Dixon; Defendant's speech was mumbled; Defendant acted nervous; and Defendant continually patted or touched his right front pocket. (Tr. at 11–

---

[1] Dixon also testified that Defendant failed to use his turn signal when making a right turn. (Tr. at 8). However, there is some confusion as to whether the traffic stop had already been initiated when this traffic violation occurred. (Tr. at 41). As a result, the Court will not take the failure to use a turn signal into consideration.

[2] Tracy Giessman testified that on the night of Defendant's arrest she and another person went to the police station to pick up Defendant's car. (Tr. at 60). Giessman did not drive Defendant's car from the police station; instead, she drove behind Defendant's car. (Tr. at 59–60, 61). Giessman testified that the driver side brake light on Defendant's car was functioning. (Tr. at 60). Geissman later stated, "I did not notice that there were any not working" and that she "think[s] [she] would probably notice if there wasn't one working." (Tr. at 63, 62). Despite Dixon's inability to remember the exact moment he noticed the brake light not functioning, as discussed by Defendant in his post-hearing brief (Doc. No. 34, pp. 6–8), the Court finds Dixon's testimony credible. Additionally, even if the brake light was functioning, the credible testimony establishes that Dixon still observed Defendant not wearing his seat belt.

AO 72A
(Rev. 8/82)

12). Defendant and Dixon returned to the driver side of Defendant's car to allow Defendant to access his insurance card. (Tr. at 12). When Defendant could not find his insurance card, Defendant and Davis went to the passenger side of Defendant's car where Defendant continued to look for his insurance card. (Tr. at 12–13). While standing at the passenger side door, Dixon noticed a black case under the rear of the driver's seat. (Tr. at 14). Dixon recognized the case to be a firearm case. (Id.). At that time, Dixon asked Defendant whether he had any weapons, drugs, or illegal items on him or in his car. (Tr. at 15, 16). Defendant responded, "I am not supposed to," which, Dixon testified, raised Dixon's suspicions. (Tr. at 16). Dixon had previously noticed that Defendant had a pocket knife "on his right side"—the pocket he was continually patting. (Tr. at 14). At that time Dixon decided to pat down Defendant in search of weapons, so Dixon performed a Terry frisk of Defendant. (Id.). Though uncertain, Dixon thinks that Davis might have returned to the immediate area at this time. (Id.). Also present by the time of the pat down were Officers Evans, Hassler, and Melendez. (Tr. at 49).

During the Terry frisk, Dixon again noticed the pocket knife in Defendant's right pocket; he also felt what he knew to be a prescription bottle in Defendant's front pocket. (Tr. at 15, 16). Dixon removed the pocket knife from Defendant's pocket and concluded the pat down. (Tr. at 15). At that point, Dixon knew that Defendant did not have a firearm on his person. (Tr. at 17). Dixon told Defendant that he felt a pill bottle in Defendant's front pocket. (Id.). Dixon asked for permission to retrieve the pill bottle, and Defendant said Dixon could retrieve it. (Id.). Dixon removed the pill bottle from Defendant's pocket, noticed that the name on the bottle was Tonya Johns, and gave the bottle to Melendez. (Id.). Melendez opened the pill bottle and told Dixon to take

AO 72A
(Rev. 8/82)

Defendant into custody, which Dixon did. (Id.). Dixon then put handcuffs on Defendant. (Id.). Defendant was placed in the only marked patrol car on the scene. (Tr. at 19). No weapons were drawn at the scene, no one yelled at Defendant, no threats or promises were made to Defendant, and no trickery was used in order to obtain Defendant's consent for Dixon to remove the pill bottle. (Tr. at 18–19).

At the time Defendant was placed in the marked patrol car, the black case that Dixon had noticed was still in the car; it was located in the immediate area where Dixon had seen Defendant reaching when Defendant's car came to a stop. (Tr. at 19). Dixon's testimony is unclear as to who performed the search of Defendant's car—seemingly Dixon and Melendez performed that search. Dixon advised Melendez to remove the firearm case from the car, which Melendez did. (Tr. at 20).

The officers did not question Defendant while at the scene of the traffic stop. (Tr. at 21). Defendant was taken to the police department where he was placed in an interview room. (Id.). The handcuffs that had been placed on Defendant were removed when he was taken to the interview room. (Tr. at 23). While in the interview room, Defendant showed no signs of mental or physical impairment or discomfort. (Tr. at 23–24). Dixon began the interview by obtaining demographic information from Defendant. (Tr. at 25). Dixon confirmed with Defendant that he could read, write, and understand English. (Tr. at 26). Next, Dixon read to Defendant, from a form, each of his Miranda rights individually, asked Defendant if he understood each right individually, got a verbal response from Defendant confirming that he did understand each of his Miranda rights individually, and had Defendant initial on the form that he understood each of the rights. (Id.). Dixon told Defendant that he wanted to talk to him about drugs and guns. (Id.).

AO 72A
(Rev. 8/82)

Then, Defendant agreed to waive his <u>Miranda</u> rights and speak with Dixon about drugs and the gun found in his car. (<u>Id.</u>). Defendant signed the form indicating that he waived his <u>Miranda</u> rights. (Tr. at 26–27).

At one point during the interview and again at the end of the interview, Defendant asked if having an attorney present would help him. (Tr. at 27). Dixon asked Defendant whether he wanted an attorney, and Defendant replied that he did not and that the interview could continue. (Tr. at 28). Dixon did not promise Defendant anything in exchange for any information Defendant provided, and Dixon did not make any threats to Defendant. (Tr. at 28–29).

Defendant asserts that all of the evidence and statements obtained as a result of the traffic stop on September 8, 2011, should be suppressed for five (5) reasons. First, Defendant contends that Dixon unreasonably prolonged the traffic stop. Defendant next contends that Dixon could not have reasonably believed that Defendant was armed and dangerous prior to conducting a <u>Terry</u> search of Defendant's person. Third, Defendant asserts that Dixon's search of his pocket was unlawful. Fourth, Defendant contends that the stop of his car was unlawful. Finally, Defendant asserts that any statements made by him were the product of an unlawful seizure and search, or, in the alternative, that any statements made by him were obtained involuntarily.

## DISCUSSION AND CITATION TO AUTHORITY

### I. Traffic stop

Defendant contends that Dixon and Davis did not have probable cause to stop his car. Dixon and Davis ostensibly stopped Defendant's car because the car's brake light was not functioning and because Defendant was not wearing his seat belt.

AO 72A
(Rev. 8/82)

Defendant contests these allegations of traffic violations factually. Additionally, Defendant contests the legality of the stop based on O.C.G.A. § 40-8-91.

"The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). A seizure in the form of a traffic stop is reasonable, and therefore constitutional, if the officer conducting the stop has "probable cause to believe a traffic violation has occurred[.]" United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). "To determine whether the officer had probable cause, we do not focus on the officer's subjective motives; rather, we focus on whether the circumstances, viewed objectively, justified the stop." United States v. Harrelson, 465 F. App'x 866, 868 (11th Cir. 2012) (citing Whren v. United States, 517 U.S. 806, 812–13 (1996)).

Dixon testified that he saw that the driver's side brake light on Defendant's car was not working and that he saw that Defendant was not wearing his seat belt. (Tr. at 8). Driving a car with an inoperable brake light is a violation of O.C.G.A. § 40-8-26. Driving a car while not wearing a seat belt is a violation of O.C.G.A. § 40-8-76.1. These traffic violations prompted Dixon and Davis to stop Defendant's car. (Tr. at 9). Because Dixon and Davis had probable cause to believe that a traffic violation occurred, their seizure of Defendant and his car was reasonable and, therefore, not in violation of Defendant's Fourth Amendment rights.

AO 72A
(Rev. 8/82)

Additionally, the legality of the traffic stop is not rendered a nullity under O.C.G.A. § 40-8-91, as Defendant argued. O.C.G.A. § 40-8-91(a) states that a car used by a person authorized to make arrests for traffic violations shall be marked with the name of the agency responsible for the person and the car. However, O.C.G.A. § 40-8-91(d) states that "[a]n otherwise lawful arrest shall not be invalidated or in any manner affected by failure to comply with this Code section." Because the traffic stop and Defendant's subsequent arrest were otherwise lawful, the fact that Dixon and Davis made the stop while driving Davis's unmarked Jeep Cherokee will not invalidate or affect either.

## II. Duration of traffic stop

Defendant alleges that Dixon unreasonably extended the length of the traffic stop. Defendant contends that Davis's written "report reveals that the officers had already effectuated the purpose of the initial stop when Officer Dixon extended the stop." (Doc. No. 12, p. 5).

"The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny . . .; (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied . . .; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny." Perkins, 348 F.3d at 969 (internal citations omitted). The instant case involves the second type of encounter thereby requiring analysis under Terry v. Ohio, 392 U.S. 1 (1968). Id.

7

Terry requires that "an officer's investigation of a traffic stop . . . be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20). Additionally, "the traffic stop must be of a limited duration. The stop 'may not last any longer than necessary to process the traffic violation *unless* there is articulable suspicion of other illegal activity.'" Id. (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis supplied) (internal punctuation omitted)).

Reasonable articulable suspicion "requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. at 1107 (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990)). The totality of the circumstances determines what reasonable suspicion is "such that, while some individual factors may be consistent with innocent travel[,] [they can also], when taken together, give rise to a reasonable suspicion." Id. (internal citation and punctuation omitted) (second alteration in original). However, "reasonable suspicion must be more than an inchoate 'hunch,' and the [F]ourth [A]mendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop." Id. (citation omitted) (alterations in original).

Defendant correctly characterizes Davis's written report which does not indicate that Davis had obtained the reasonable suspicion necessary to prolong the traffic stop. However, Davis was not the only officer on the scene. Dixon testified that while Davis was in his Jeep performing a check on Defendant's license, Dixon spoke with Defendant. (Tr. at 11). Defendant did not make eye contact with Dixon; Defendant's

AO 72A
(Rev. 8/82)

speech was mumbled; Defendant acted nervous; and Defendant continually patted or touched his right front pocket. (Tr. at 11–12). Defendant and Dixon went to the driver side of Defendant's car to allow Defendant to access his insurance card. (Tr. at 12). When Defendant could not find his insurance card, Defendant and Davis went to the passenger side of Defendant's car where Defendant continued to look for his insurance card. (Tr. at 12–13). While standing at the passenger side door, Dixon noticed a black case under the rear of the driver's seat. (Tr. at 14). Dixon recognized the case to be a firearm case. (Id.). At that time, Dixon asked Defendant whether he had any weapons, drugs, or illegal items on him or in his car. (Tr. at 15, 16). Defendant responded, "I am not supposed to," which, Dixon testified, raised Dixon's suspicions. (Tr. at 16). Dixon had previously noticed that Defendant had a pocket knife "on his right side"—the pocket he was continually patting. (Tr. at 14). Based on Dixon's observations of Defendant's mannerisms and objects on Defendant's person and in Defendant's car, all of which occurred while Davis was performing a check on Defendant's license pursuant to the traffic stop,[3] Dixon obtained reasonable and articulable suspicion to prolong the seizure of Defendant past the time necessary to conduct the traffic stop. The duration of Dixon's seizure of Defendant, therefore, did not violate Defendant's Fourth Amendment rights.

## III. Terry frisk

---

[3] Defendant argues that "Officer Dixon saw the [firearm] case and conducted the questioning after Officer Davis had already run a license and insurance check on [Defendant] and his vehicle, returned to [Defendant's] vehicle, and informed Officer Dixon that [Defendant's] license and insurance were valid." (Doc. No. 34, p. 10). The credible testimony establishes only that Davis might have returned to Defendant's car by the time of the Terry search. (Tr. at 14). Prior to the Terry search, and while Davis was in his Jeep performing a check on Defendant's license, Dixon obtained reasonable and articulable suspicion to prolong the seizure of Defendant past the time necessary to conduct the traffic stop, as explained above.

AO 72A
(Rev. 8/82)

Defendant contends that the frisk of his person by Dixon was unlawful. Defendant asserts that in addition to his seizure being unlawful at the time of the Terry frisk due to his stop being unreasonably prolonged, Dixon could not have reasonably believed that Defendant was armed and dangerous prior to frisking him. Defendant also contends that Dixon performed the Terry frisk based on Melendez's instructions.

A brief search of a person that is equivalent to a pat down or a frisk, known as a Terry frisk, is lawful if a two-part test is met. First, a police officer may seize a person when the police officer reasonably suspects that the person is committing or has committed a criminal offense. United States v. Reed, 402 F. App'x 413, 414 (11th Cir. 2010) (citing Arizona v. Johnson, 555 U.S. 323, 326 (2009)). Second, "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." Id. at 415 (quoting Johnson, 555 U.S. at 326–27).

To determine whether reasonable suspicion exists, "courts must review the 'totality of the circumstances' to ascertain whether the officer had 'some minimal level of objective justification' to suspect legal wrongdoing." Id. (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[A] series of acts, each of them perhaps innocent in itself . . . taken together [can] warrant[ ] further investigation." Id. (quoting Terry, 392 U.S. at 22) (alterations in original). The officer is permitted to rely on inferences and deductions to form reasonable suspicion. Id. Some factors that might affect an officer's determination of reasonable suspicion are: characteristics of a location, such as whether the stop occurred in a high crime area; nervous or evasive behavior; and visibility of a bulge in the person's clothing, which might indicate the presence of contraband or a weapon. Id. at 415–16.

AO 72A
(Rev. 8/82)

As previously determined, Dixon's seizure of Defendant at the time of the <u>Terry</u> frisk was reasonable. As to proceeding to the frisk, Dixon testified that Defendant had left a house suspected of illegal activity. (Tr. at 7). Dixon testified that Defendant appeared nervous throughout their interaction. (Tr. at 11–12, 13). Dixon also testified that he noticed a black case under the rear of the driver's seat of Defendant's car. (Tr. at 14). Dixon recognized the case to be a firearm case. (<u>Id.</u>). When Dixon asked Defendant whether he had any weapons, drugs, or illegal items on him or in his car, Defendant responded, "I am not supposed to," which, Dixon testified, raised Dixon's suspicions. (Tr. at 15–16). Dixon had previously noticed that Defendant had a pocket knife "on his right side"—the pocket he was continually patting. (Tr. at 14). Dixon knew that Defendant had a pocket knife in his pocket. Dixon did not know that Defendant did not have a gun on his person, and any suspicion that Defendant had a gun on his person was reasonable because Dixon had seen a firearm case in Defendant's car. Dixon reasonably suspected that Defendant was armed and dangerous.

Defendant argues that Dixon prolonged the stop and performed the <u>Terry</u> frisk based on Melendez's instructions. Defendant further contends that Melendez had just arrived on the scene and therefore could not have developed reasonable suspicion to justify prolonging the stop or reasonable suspicion that Defendant was armed and dangerous. Melendez testified that when he arrived on the scene Defendant was seated in the front passenger seat of his car while Dixon stood beside the car door. (Tr. at 65). Melendez also testified that he approached Defendant's car and "informed Investigator Dixon to have [Defendant] step out of the vehicle and then [he] stepped back." (<u>Id.</u>). Dixon performed the <u>Terry</u> frisk immediately after Defendant got out of the

AO 72A
(Rev. 8/82)

car. (Tr. at 66). There is no evidence establishing that Melendez instructed Dixon to perform the Terry frisk. Dixon testified that while standing at the passenger side door, he noticed a black case under the rear of the driver's seat. (Tr. at 14). Dixon recognized the case to be a firearm case. (Id.). At that time, Dixon asked Defendant whether he had any weapons, drugs, or illegal items on him or in his car. (Tr. at 15, 16). Defendant responded, "I am not supposed to," which, Dixon testified, raised Dixon's suspicions. (Tr. at 16). Dixon had previously noticed that Defendant had a pocket knife "on his right side"—the pocket he was continually patting. (Tr. at 14). At that time Dixon decided to pat down Defendant in search of weapons, so Dixon performed a Terry frisk of Defendant. (Id.). As previously determined, Dixon reasonably suspected that Defendant was armed and dangerous. Melendez's involvement, by suggesting to Dixon to order Defendant out of the car, does not change Dixon's testimony. The Terry frisk did not violate Defendant's Fourth Amendment rights.

**IV. Search of Defendant's pocket, legality of Defendant's arrest, and search of Defendant's car**

Defendant asserts that Dixon's search of his pocket was unlawful. Defendant argues that he did not give consent for the search of his pocket and that even if he did give consent that the consent was not voluntary. Defendant also argues that the search of his pocket was not permissible under the "plain feel" doctrine.

Consent to search must be freely given, and the totality of the circumstances determines whether the consent was knowingly and voluntarily given. See United States v. Ramirez-Chilel, 289 F.3d 744, 752–53 (11th Cir. 2002). The "determination of consent" is based on "an objective standard[.]" United States v. Mercer, 541 F.3d 1070,

AO 72A
(Rev. 8/82)

1074 (11th Cir. 2008) (quoting <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 188 (1990)). "[C]onsent must be voluntarily given by a person having, or reasonably appearing to have, authority to do so." <u>United States v. Ochoa</u>, 402 F. App'x 478, 483 (11th Cir. 2010) (citing <u>United States v. Dunkley</u>, 911 F.2d 522, 525 (11th Cir. 1990)).

The credible testimony establishes that Defendant gave voluntary consent for the search of his pocket.[4] (Tr. at 17). Whether Defendant had the authority to give consent for the search of his pocket is not disputed. Therefore, the search of Defendant's pocket and seizure of a pill bottle from his pocket did not violate Defendant's Fourth Amendment rights.

Even though Defendant's consent was sufficient, because Defendant argued that the search of his pocket was not permissible under the "plain feel" doctrine, the Court will address this argument. "[S]eizure of contraband during a lawful protective frisk is constitutionally permissible, if the 'contour or mass makes [the contraband's] identity immediately apparent' to the searching officer." <u>Reed</u>, 402 F. App'x at 415 (quoting <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375–76 (1993)) (second alteration in original). The Supreme Court has explained that "immediately apparent" means that the officer

---

[4] Defendant correctly points out that Melendez testified that he did not hear Dixon ask Defendant for consent to search his pocket. (Tr. at 67). However, Melendez's full testimony on the subject was "I was not close enough to hear, no." (Id.). Defendant discusses Melendez's incident report, written on the night of the incident, which stated that Dixon "handed" the pill bottle to Melendez; Defendant also discusses Dixon's previous testimony to the Glynn County Magistrate Court wherein Dixon said Melendez was "right beside" Dixon after Dixon retrieved the pill bottle from Defendant's pocket. (Doc. No. 34, p. 14). Defendant argues that because Melendez did not hear Dixon obtain consent from Defendant, the conversation must not have occurred. (Id.). Melendez testified that when he arrived on the scene he approached Defendant's car and "informed Investigator Dixon to have [Defendant] step out of the vehicle and then [he] stepped back." (Tr. at 65). Melendez also testified that he doesn't know whether Dixon could have heard him after he stepped back. (Tr. at 66). Melendez further testified that after he stepped back he was not in a position to hear any conversation between Dixon and Defendant. (Tr. at 67–68). Melendez and Dixon both testified that Dixon "tossed" the pill bottle to Melendez, indicating that Melendez was not right beside Dixon. (Tr. at 67, 51–52). That Melendez did not hear Dixon obtain Defendant's consent to search his pocket is not dispositive. Dixon's credible testimony establishes that he obtained Defendant's voluntary consent. (Tr. at 17).

13

has probable cause to believe that the object is contraband. Dickerson, 508 U.S. at 375 ("If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent,—the plain-view doctrine cannot justify its seizure.") (internal quotation marks and citations omitted) (alteration in original). A totality of the circumstances test is used. See United States v. Lawrence, 205 F. App'x 786 (11th Cir. 2006).

Defendant asserts that because possessing a pill bottle is not unlawful, "Dixon's feeling of the pill bottle did not reveal the incriminating nature of the alleged contraband." (Doc. No. 12, p. 8). Defendant cites Dickerson and Stanley v. Georgia, 394 U.S. 557 (1969), in support of his argument.

In Dickerson, while performing a Terry frisk, a police officer felt "a small, hard object wrapped in plastic" in the defendant's pocket. Dickerson, 508 U.S. at 377. The Minnesota Supreme Court determined that the officer's own testimony resulted in a finding that he did not immediately recognize the lump as crack cocaine. Instead, "the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket[.]'" Id. at 378. The United States Supreme Court agreed and held that the crack cocaine was not immediately apparent as such under the "plain feel" doctrine and that the police officer exceeded the bounds of the Terry search. In Stanley, a search warrant was issued for the defendant's home based on an investigation of the defendant's alleged bookmaking activities. While in the defendant's home, the police officers executing the search warrant found three reels of eight-millimeter film. Using a projector and screen in the

AO 72A
(Rev. 8/82)

defendant's home, the police officers viewed the films and found obscene material. The defendant was arrested for knowingly possessing obscene material in violation of Georgia law. Ultimately, the Supreme Court of the United States determined that the obscene material was not in plain view in the defendant's home because "the contents of the films could not be determined by mere inspection." Stanley, 394 U.S. at 571.

The instant case is distinguishable from both Dickerson and Stanley. Dixon testified that during the Terry frisk he felt what he knew to be a prescription bottle in Defendant's front pocket. (Tr. at 15, 16). Unlike the officer in Dickerson, there is no evidence showing that Dixon squeezed, manipulated, or otherwise prodded the contents of Defendant's pocket to determine that the pill bottle was a pill bottle. Unlike the officers in Stanley, Dixon had probable cause to believe that the pill bottle and its contents were contraband. In Stanley, the officers were in the defendant's home searching for evidence of the defendant's alleged bookmaking activities. The officers had no basis to suspect that the reels of film contained obscene material. Conversely, in the instant case, Dixon and Davis saw Defendant leave a home suspected of dealing in prescription narcotics. (Tr. at 7). Dixon had probable cause to believe that the pill bottle in Defendant's pocket contained illegal narcotics. As a result, Dixon could have seized the pill bottle under the "plain feel" doctrine. Regardless of whether Dixon could have seized the pill bottle under the "plain feel" doctrine, Dixon sought and obtained consent to search Defendant's pocket.

Defendant also contends that, because the search of his pocket and seizure of the pill bottle from his pocket were unlawful, his arrest for possession of the pill bottle and its contents was also unlawful. As previously discussed, the search of Defendant's

pocket and seizure of the pill bottle from his pocket did not violate Defendant's Fourth Amendment rights. As a result, Defendant's arrest for possession of narcotics under Georgia law was lawful. See O.C.G.A. Title 16, Chapter 13.

Defendant further asserts that, because his arrest was unlawful, the search of his car and seizure of a firearm from his car were also unlawful and that the evidence of the firearm should be excluded as "fruit of a poisonous tree." Defendant's arrest was lawful, as explained in the preceding paragraph. The search of Defendant's car was a lawful search incident to arrest. "Police may search a vehicle incident to a recent occupant's arrest . . . if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 556 U.S. 332, 351 (2009). Dixon testified that based on his experience he expected to find additional evidence of possession of narcotics in Defendant's car. (Tr. at 20). Because Dixon had reason to believe that Defendant's car contained additional evidence of possession of narcotics, Dixon was authorized under Gant to search Defendant's car incident to Defendant's arrest. Dixon was also authorized to open the black container which held the firearm because the scope of the search of Defendant's car was "defined by the object of the search and the places in which there is probable cause to believe that it may be found." United States v. Ross, 456 U.S. 798, 824 (1982). Once the firearm case was lawfully opened, the firearm was in plain view. Under the "plain view" doctrine, a police officer who is lawfully conducting a search may seize an object in "plain view" if the incriminating nature of that object is "immediately apparent." Dickerson, 508 U.S. at 375. The incriminating nature of an object is "immediately apparent" if the officer has probable cause to believe the object is contraband without conducting a further search of the object. Id. Dixon testified that he

AO 72A
(Rev. 8/82)

asked Defendant whether he had any weapons, drugs, or illegal items on him or in his car. (Tr. at 15, 16). Defendant responded, "I am not supposed to." (Tr. at 16). Defendant's statement, that he was not supposed to have a firearm on him or in his car, gave Dixon probable cause to believe that the firearm was contraband. As a result, Dixon's seizure of the firearm did not violate Defendant's Fourth Amendment rights.

Even if the search of Defendant's car had not been a lawful search incident to arrest, the firearm found in Defendant's car is still admissible evidence. After arresting a person, officials may impound the person's vehicle. See United States v. Caudle, 430 F. App'x 809, 811 (11th Cir. 2011). Officials may perform a thorough inventory search of a legally impounded car. United States v. Kalu, 2012 WL 3064508 *2 (11th Cir. July 30, 2012) (citing South Dakota v. Opperman, 428 U.S. 364 (1976), and United States v. O'Bryant, 775 F.2d 1528 (11th Cir. 1985)). "Opperman inventory searches are justified on several grounds: deterrence of false claims of loss made against police departments, safeguard against theft or careless handling of recovered articles, and protection of police from potentially dangerous material in articles held at the station house." O'Bryant, 775 F.2d at 1534 (citation omitted). A post-impoundment inventory search of Defendant's car would have been justified under Opperman and Kalu. During an inventory search, officials would inevitably have discovered the firearm in its case.[5] As a result, the firearm is admissible under the doctrine of inevitable discovery. United States v. Smith, 2012 WL 2864409 *3 (11th Cir. July 12, 2012) (citing Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004), which explained that the doctrine of

---

[5] Defendant argues that there is no evidence that an inventory search was ever conducted on his car. The Court agrees with this assertion. However, the officers did take Defendant's car to the police station. (Tr. at 59). By the time the car was at the police station the officers knew the contents of the car because they had already performed a search. There is also no evidence to suggest that an inventory search still would not have been performed had a search not been performed at the scene.

AO 72A
(Rev. 8/82)

inevitable discovery permits introduction of evidence that would have been eventually found, even if the search that uncovered it was itself unconstitutional). Therefore, even if the search of Defendant's car and seizure of a firearm from his car violated Defendant's Fourth Amendment rights, the firearm is still admissible evidence.

## V. Statements made by Defendant

Defendant contends that any statements he made grew out of the unlawful stop and search and should, therefore, be suppressed. Alternatively, Defendant argues that any statements are independently due to be suppressed because they were made involuntarily in violation of Defendant's Fifth Amendment rights.

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. Under Miranda v. Arizona, 384 U.S. 436 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." United States v. Wright, 300 F. App'x 627, 632 (11th Cir. 2008) (quoting United States v. Parr, 716 F.2d 796, 817 (11th Cir. 1983)). "The government bears a 'heavy burden' to demonstrate that the waiver was voluntary, knowing, and intelligent. The Supreme Court has stated that this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence." Hall v. Thomas, 611 F.3d 1259, 1285 (11th Cir. 2010) (internal punctuation and citations omitted). A request for counsel made during interrogation must be clear and unambiguous. See Owen v. Fla. Dep't of Corr., 2012 WL 2805049 *10 (11th Cir. July 11, 2012) (citing Davis v. United States, 512 U.S. 452, 459, 461–62 (1994), wherein the Supreme Court stated that a "suspect must unambiguously request counsel" and "[i]f the suspect's statement is not an

18

unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him").

The stop and search of Defendant did not violate Defendant's Fourth Amendment rights. As to the voluntariness of Defendant's statements, Dixon testified that he began the interview by obtaining demographic information from Defendant. (Tr. at 25). Dixon confirmed with Defendant that he could read, write, and understand English. (Tr. at 26). Next, Dixon read to Defendant, from a form, each of his Miranda rights individually, asked Defendant if he understood each right individually, got a verbal response from Defendant confirming that he did understand each of his Miranda rights individually, and had Defendant initial on the form that he understood each of the rights. (Id.). Dixon told Defendant that he wanted to talk to him about drugs and guns. (Id.). Then, Defendant agreed to waive his Miranda rights and speak with Dixon about drugs and the gun found in his car. (Id.). Defendant signed the form indicating that he waived his Miranda rights. (Tr. at 26–27). The handcuffs that had been placed on Defendant were removed when he was taken to the interview room. (Tr. at 23). While in the interview room, Defendant showed no signs of mental or physical impairment or discomfort. (Tr. at 23–24). Dixon did not promise Defendant anything in exchange for any information Defendant provided, and Dixon did not make any threats to Defendant. (Tr. at 28–29). There is no indication that Defendant's waiver of his Miranda rights was not voluntary, knowing, and intelligent.

Defendant asserts that Melendez, also present during the interview, cut off Defendant's questions and told Defendant that "beggars cannot be choosers." (Doc. No. 34, p. 17). Defendant argues that Melendez's actions left him with the impression

that he had no choice but to answer the officers' questions. Defendant had been clearly advised of his rights and knew that he had the right to remain silent.

At one point during the interview and again at the end of the interview, Defendant asked if having an attorney present would help him. (Tr. at 27). Dixon asked Defendant whether he wanted an attorney, and Defendant replied that he did not and that the interview could continue. (Tr. at 28). There is no indication that Defendant ever clearly, unambiguously, or unequivocally asked for an attorney. Any statements made by Defendant were not made in violation of his Fifth Amendment rights.

## VI. Defendant's felony conviction obtained the Superior Court of Jeff Davis County

Defendant asserts in his post-hearing brief that in his Motion to Suppress he sought to exclude his 1999 state felony conviction obtained in the Superior Court of Jeff Davis County. Defendant states that the Government did not respond on this issue and, therefore, apparently agrees with him.

Defendant's Motion does not address his 1999 state felony conviction obtained in the Superior Court of Jeff Davis County. As a result, the Government did not address the admissibility of that conviction. Defendant's post-hearing brief states that the relevant state conviction was obtained in violation of the Sixth and Fourteenth Amendments because it was obtained without counsel and without a valid waiver of counsel. Defendant offers nothing in support of this assertion. There is no basis for the Court to exclude evidence of Defendant's 1999 state felony conviction obtained in the Superior Court of Jeff Davis County.

AO 72A
(Rev. 8/82)

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendant's Motion to Suppress be **DENIED**. Because a hearing was held, Defendant's Motion for Hearing on Jackson v. Denno issues is **DISMISSED** as moot.

**SO REPORTED** and **RECOMMENDED**, this _30th_ day of August, 2012.


JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)